IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-HC-2082-D

| | | |
|---|---|---|
| CLINTON SMITH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| GERALD BRANKER, Warden, | ) | |
| Central Prison, Raleigh, North Carolina, | ) | |
| | ) | |
| Respondent. | ) | |

Clinton Cebert Smith ("petitioner") was sentenced to death for the first-degree murder by means of poison of his daughter Britteny Cotton. Smith also was convicted of three counts of attempted first-degree murder by means of poison of Jamal Cotton (his son), Breanca Cotton (his daughter), and Sylvia Cotton (the mother of Britteny, Jamal, and Breanca). On November 6, 2008, the Halifax County Superior Court vacated Smith's death sentence based on Smith's mental retardation, and imposed a life sentence without the possibility of parole. Smith seeks a writ of habeas corpus under 28 U.S.C. § 2254 vacating his convictions, or alternatively, his sentences. Respondent filed a motion for summary judgment [D.E. 11]. Smith filed a response [D.E. 14]. For the reasons explained below, respondent's motion for summary judgment is granted, and the petition for writ of habeas corpus is dismissed.

I.

The court summarizes the following facts from the state-court record, including a June 19, 2002 order of the Halifax County Superior Court,[1] and the opinion of the North Carolina Supreme

---

[1] The order is attached to Smith's petition as Exhibit 6.

Court affirming Smith's convictions and sentences. See State v. Smith, 351 N.C. 251 (2000). Smith dated Sylvia Cotton ("Sylvia") for a number of years and they had three children together: Britteny, Jamal, and Breanca Cotton. Smith played no role in rearing the three children. He also asked Sylvia not to name him as the father of their children because he was paying child support for another child of his and could not afford to pay for the three children that he had with Sylvia.

In 1995, Smith wanted to resume his relationship with Sylvia, but she had a boyfriend and was not interested. Smith became angry and told her if he could not have her, then her new boyfriend could not have her either. He also stated that he was not going to let anyone else raise his children. In another conversation, Smith threatened to shoot Sylvia and her new boyfriend if he saw them together.

In 1995, Smith worked part-time at Gallberry Farm. Smith told his co-worker, Thurman Arrington, that he was going to beat up Sylvia's boyfriend. In connection with his duties at the farm, Smith handled farm chemicals and had access to locked chemical bins containing lethal pesticides, including Temik and Di-Syston.[2] Smith also worked part-time at an Etna gas station. In October 1995, when Smith discovered Sylvia had a new boyfriend, he told an Etna co-worker that if he found out who the new boyfriend was, he would "get him." Smith asked the co-worker whether police would have sufficient evidence to convict Smith if he told somebody he was going to kill a person and then did so. Smith also told the co-worker that the Department of Social Services ("DSS") was taking over half his paycheck for child support for the three children, and he was tired of paying.

On January 16, 1996, at 6:30 a.m., Arrington arrived at the Etna gas station where Smith worked. Smith was inside the gas station and asked Arrington what time they were supposed to

---

[2] Di-Syston is the brand name of the pesticide at issue in this case. It is known generically as disulfoton and is an organophosphate compound.

report to work at the farm. Smith then said he was going to get some Temik because his father wanted to kill some big rats at his house. Smith left the gas station in his truck. At about 7:30 a.m. or 8:30 a.m., Arrington was sitting in his truck outside a diner, along with Anthony Hines, another Gallberry Farm co-worker. Smith drove up, got out of his truck, and walked over to Arrington carrying a brown paper grocery bag. Smith told Arrington that he got the Temik to kill the rats at his father's house, and opened the bag to show Arrington the contents. Arrington warned Smith the chemical was dangerous and to be careful with it. Hines also saw the contents of the bag. After Smith drove away, Arrington told Hines the contents of the bag looked like Di-Syston rather than Temik. Although scheduled to do so, Smith did not work at Gallberry Farm that day.

On her way to work that same day, Sylvia took the children to babysitter Ellen Lassiter's house about 5:30 a.m. Lassiter lived across the street from Sylvia. Lassiter put Jamal and Breanca on their school bus at 7:00 a.m. Between 7:30 a.m. and 8:00 a.m., Lassiter and Britteny saw Smith enter Sylvia's house. As the morning progressed, Lassiter saw Smith's pickup truck parked down the street from Sylvia's house. Around 10:00 a.m. or 10:30 a.m., Lassiter noticed the truck again, but this time it was parked beside Smith's sister's house, directly across the street from Lassiter, and next door to Sylvia's house. Lassiter last noticed the truck around 4:00 p.m. Another neighbor, who lived on the same street as Sylvia and Lassiter, saw Smith coming out of Sylvia's house twice between 10:00 a.m. and 10:15 a.m. On the second trip, the neighbor greeted Smith and observed a folded-over brown grocery bag in his hand.

Sylvia got home from work shortly after 5:00 p.m., went inside her house, and noticed some balloons and a box on top of her VCR in the living room. She believed that the box and balloons were from Smith because, even though Sylvia had never given Smith a key to her house, he was the only one who went into her house without her permission. When Sylvia went to Lassiter's house

3

to retrieve the children around 5:30 p.m., Lassiter told Sylvia that Smith had gone into her house. Sylvia replied that Smith had left balloons and other items there in an attempt to get back together again. Thereafter, Sylvia and her three children went home, and Sylvia began cooking dinner. Sylvia noticed the kitchen had a funny smell, and testified at the trial that it was the same smell as the State's exhibit of Di-Syston.

While Sylvia was preparing dinner, Breanca asked for some Kool-Aid. Sylvia got a pitcher of cherry Kool-Aid out of the refrigerator and poured the drink into glasses for the children. One of the children told Sylvia the Kool-Aid did not taste right. Thereafter, Sylvia tasted the Kool-Aid and found it to be gritty and bitter. Looking into the Kool-Aid pitcher, she saw something that looked like grit and little red strings in the liquid. She dumped out the contents of the pitcher, prepared a fresh batch of Kool-Aid, and gave it to her children.

Sometime after 11:00 p.m., Breanca awakened Sylvia because Britteny had become ill. Britteny had bubbly spit coming from her mouth and her stomach was hurting and appeared swollen. Shortly thereafter, Jamal became ill with diarrhea, and Sylvia noticed that his lips were chapped. Sylvia tended to the children. Around 11:30 p.m. or 11:45 p.m., she called her aunt, Carolyn Williams. Williams took Sylvia and the children to the hospital during the early morning hours of January 17, 1996. A doctor thought the problem might be a twenty-four-hour virus and gave Britteny and Jamal an injection for vomiting and diarrhea.

On the way home from the hospital, Breanca began complaining that her stomach was hurting. All three children were sick throughout the night. Later that morning, when Sylvia went to wake her children, she noticed that Britteny's mouth was purplish-grey and that she appeared to have no heartbeat. Sylvia called 911, and the ambulance took Britteny and Jamal to the hospital. Williams drove Sylvia and Breanca to the hospital in a separate car. Smith arrived at the hospital

4

about an hour after Sylvia and the others.

While waiting in the emergency room, Breanca began vomiting, and doctors began treating her. Shortly thereafter, Sylvia began to feel sick herself, and complained to a doctor about having a terrible headache and being disoriented. The doctor gave Sylvia oxygen and a tranquilizer. Subsequently, a doctor told Sylvia that Britteny had died, and the other two children were being transferred to Pitt Memorial Hospital.

Sylvia went to Britteny's room to see her. When she got to Britteny's room, Smith was already there, along with Williams, a cousin, and a nurse. Smith asked the nurse whether Britteny had died of carbon monoxide poisoning, and repeatedly stated that Britteny died of carbon monoxide poisoning because of Sylvia's cooking stove. Thereafter, Smith left to visit the other two children at Pitt Memorial Hospital.

Dr. John Meredith was working at Pitt Memorial on January 17, 1996. Dr. Meredith testified about the steps taken to treat Breanca and Jamal. Dr. Meredith testified that tests revealed the two children were not suffering from carbon monoxide poisoning. Rather, they had symptoms consistent with organophosphate poisoning. Dr. Meredith also testified that Smith appeared, stating that he was the father of the two children and that they had been poisoned by their mother. A social worker who was on duty the same day observed Dr. Meredith and Smith talking. She later spoke to Smith, asked him what had happened to the children, and what if anything he had given them to eat or drink. Smith replied that he had not done anything and that Sylvia must have given the children some Kool-Aid.

Later that evening, Sylvia went to Pitt Memorial Hospital to see Breanca and Jamal. Jamal was in intensive care. Breanca was in a regular room. When Sylvia went to see Breanca, Breanca immediately told Sylvia that Smith had said that Sylvia was a bad person because she had given bad

5

chicken to the children. Breanca was released from Pitt Memorial Hospital after about a week of treatment. Jamal was released approximately two days after Breanca.

On January 19, 1996, Smith saw Arrington and told him that Smith's parents had asked that Arrington say nothing about obtaining the poison. While officers were investigating the case, they found a brown paper grocery bag with traces of Di-Syston in Sylvia's trash can. At the conclusion of the investigation, Smith was indicted for first-degree murder and three counts of attempted first-degree murder.

While preparing for Smith's trial, the Halifax County District Attorney ("D.A.") contacted Darrell Sumner, Ph.D., as someone who might explain the effects of organophosphate poisoning on the human body to the jury. The D.A. and some members of his staff interviewed Sumner. After the interview, the D.A. decided not to hire him. Thereafter, the D.A. received a copy of a February 9, 1998 letter Sumner wrote to Bayer, the manufacturer of Di-Syston. In the letter, Sumner was concerned with four issues that he saw in the case: (1) the time lapse between the victims' ingestion of the Di-Syston and the onset of symptoms; (2) the solubility of Di-Syston in water; (3) whether Britteny had ingested a sufficient quantity of Di-Syston to cause her death; and (4) whether an autopsy had determined Britteny's acetylcholinesterase level. The D.A. later received a fax from Sumner stating that the toxicology and autopsy reports supplied to him by the D.A.'s office answered his question about acetylcholinesterase level. The D.A. never received any response from Bayer to Sumner's letter and did not provide Sumner's letter to defense counsel.

The D.A. produced four expert witnesses to testify at trial, including a toxicologist named Dr. Anderson. None raised the issues Sumner identified in his letter to Bayer. Smith's counsel hired their own expert toxicologist, Dr. Mason, who is an expert in organophosphate poisons and chemistry. Mason agreed with the State's position on the level of poisoning and cause of death, and

6

the defense decided not to call him at trial.

One of Smith's attorneys, Sam Barnes, researched organophosphate poisoning before trial. He obtained information from Bayer, including a material safety data sheet on Di-Syston. The data sheet provided information on the chemical's physical form, appearance, color, odor, solubility, and the acute effects of exposure. Barnes spent more than six hours consulting with Dr. Mason. They discussed the autopsy report, Dr. Anderson's toxicology report, the solubility of disulfoton, and the time lapse between Britteny's ingestion of the pesticide and the onset of her symptoms. Dr. Mason agreed with Dr. Anderson's conclusions, but gave Barnes some advice for cross-examining Dr. Anderson.

II.

On April 7, 1998, a jury in Halifax County Superior Court convicted Smith of the first-degree murder by poison of Britteny and the attempted first-degree murders by poison of Jamal, Breanca, and Sylvia. On April 13, 1998, after a sentencing hearing, the jury recommended the death penalty for the first-degree murder. The trial court imposed the death sentence and three consecutive terms of a minimum of 276 months' and a maximum of 341 months' imprisonment for the three attempted murder convictions.

Smith appealed to the North Carolina Supreme Court. On February 4, 2000, the North Carolina Supreme Court found no error at either phase of Smith's capital trial. State v. Smith, 351 N.C. 251 (2000). On October 2, 2000, the United States Supreme Court denied certiorari. Smith v. North Carolina, 531 U.S. 862 (2000).

On May 30, 2001, in Halifax County Superior Court, Smith filed, through counsel, a motion for appropriate relief ("MAR"). On September 12, 2001, Smith filed an amended motion for appropriate relief ("AMAR"). The MAR court denied some claims in the MAR and AMAR on the

pleadings and held an evidentiary hearing on the remainder. On June 17, 2002, the MAR court entered two orders denying all claims in Smith's MAR and AMAR.

Of relevance to Smith's current section 2254 petition, the MAR court considered and heard evidence on Smith's claim that the D.A. withheld material exculpatory evidence in the form of Sumner's February 9, 1998 letter to Bayer. Smith's counsel testified that they thought the Sumner letter raised questions as to whether disulfoton was in Britteny's body and whether it caused her death. Had they known of the Sumner letter, they would have discussed it with Dr. Mason, would have contacted Sumner to inquire further about Sumner's questions, and would have contacted the person at Bayer to whom the letter was addressed. The MAR court found that "[t]he Sumner letter expresses the gaps Sumner perceived in the State's case." Pet. Ex. 6 at 11 (¶ 25).

Sumner testified at the evidentiary hearing. Sumner felt that the State's testing was insufficient in certain number of areas, including the failure to resolve the solubility issue, obtain the acetylcholinesterase number on Britteny's brain sample, and measure the metabolites in Britteny's liver, kidney, and blood. Sumner felt that these perceived deficiencies in the State's testing meant that "the data were inadequate to draw the conclusion that Britteny had a lethal dose of disulfoton in her system." Id. at 12 (¶ 30). Before the evidentiary hearing, Sumner attempted to dissolve some of the State's Dy-Siston in Kool-Aid and stated that it "had turned to 'mud.'"[3] Id. at 17 (¶ 48). Sumner is not a forensic scientist, and he never discussed the case with the State's expert witnesses or the doctors at Pitt Memorial Hospital. He also did not examine the data regarding the solubility

---

[3] The MAR court found that "Sumner's testing of an unknown amount of the State's trial exhibit (the original bag of Di-Syston seized from [the f]arm) in an equally unknown amount of Kool-Aid, particularly when this was done six years after the murder, is uninstructive to the Court." The MAR court further noted that Sylvia testified "that when she looked at the original Kool-Aid in the pitcher, the liquid contained what looked like grit and little red strings." Pet. Ex. 6 at 17 (¶ 48).

of disulfoton until two months before the evidentiary hearing. Sumner also admitted "that to his knowledge, there was no evidence for the cause of Britteny's death other than by disulfoton poisoning." Id. at 13 (¶ 32).

Dr. Anderson reviewed his testing and conclusions in light of Sumner's testimony at the evidentiary hearing, and stated that his conclusions remained unchanged. Id. at 13–15 (¶¶ 33–40). The MAR court "f[ou]nd[] that because Anderson found the parent compound, i.e. the actual disulfoton, in Britteny's samples, the identification of metabolites and measurement of the brain cholinesterase would have been corroborative information only, particularly in view of the autopsy results showing no other cause of death." Id. at 18 (¶ 50). The doctor who performed the autopsy on Britteny also testified at the evidentiary hearing, noting that blood samples from Britteny found no carbon monoxide was present, that Britteny had no physical injury to suggest that she had suffered any trauma, and that post-mortem chemistry to evaluate natural diseases was all negative. Thus, the doctor concluded that Britteny had a level of disulfoton in her tissues satisfactory to explain her death. Id. at 15–16 (¶¶ 43–44).

The MAR court concluded:

> other evidence in the case provided overwhelming evidence that defendant was responsible for the introduction of the poison into the Kool-Aid the family drank on the evening of the crimes. The answer to Sumner's question about the solubility of disulfoton was readily available to Sumner in the form of public information disseminated by Bayer and was in fact in the possession of defense counsel and their own toxicology expert before trial. See Hoke v. Netherland, 92 F.3d 1350, 1355 (4th Cir.), cert. denied, 519 U.S. 1048 (1996). The Court finds from defense counsel Barnes' credible testimony that he discussed both the question of solubility of disulfoton and the question of time lapse between ingestion and onset of symptoms with the defense toxicologist. There is no evidence before this Court that either of the forensic toxicologists working on the case for the State or for the defense pretrial ever raised the solubility of disulfoton in Kool-Aid as a question bearing on the actual cause of Britteny's death.

Id. at 19 (¶ 52) (citation omitted). Accordingly, the MAR court found that the D.A. did not violate

Brady v. Maryland, 373 U.S. 83 (1963), in failing to provide the Sumner letter to counsel for Smith, and denied this claim on its merits. Id. at 20.

Meanwhile, on January 31, 2002, Smith filed a motion pursuant to N.C. Gen. Stat. § 15A-2005 and N.C. Gen. Stat. § 15A-2006 for imposition of a life sentence on the grounds that he was mentally retarded when he murdered Britteny Cotton. On September 12–13, 2005, the Halifax County Superior Court held an evidentiary hearing dealing solely with Smith's claim of mental retardation. On November 6, 2008, the superior court granted the motion, vacated Smith's death sentence for his first-degree murder of Britteny Cotton, and imposed a life sentence without the possibility of parole for that murder. On November 13, 2008, the State removed Smith from death row.

On January 5, 2009, Smith filed a certiorari petition in the North Carolina Court of Appeals. The North Carolina Court of Appeals denied Smith's petition for writ of certiorari on February 13, 2009. State v. Smith, No. COAP09-38 (N.C. Ct. App. Feb. 13, 2009) (unpublished order).

On June 18, 2009, Smith filed his petition for writ of habeas corpus, raising the alleged Brady violation and seeking an evidentiary hearing. On October 13, 2009, respondent filed an answer to the petition and a motion for summary judgment [D.E. 9–11]. On December 2, 2009, Smith filed a response [D.E. 14].

III.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, precludes this court from granting relief unless the state-court decision was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented" in the state-court proceeding. 28 U.S.C. § 2254(d).

The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state-court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412–13. A state-court decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see Renico v. Lett, 130 S. Ct. 1855, 1862 (2010).

If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and the clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law. Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000) (en banc). Moreover, the factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Id.; Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010).

11

IV.

Smith relies on Brady and argues he is entitled to habeas relief vacating his convictions because the State withheld exculpatory, material evidence in the form of the letter from Sumner to Bayer. See Pet. 7–20. The parties agree that Smith has exhausted his state-court remedies as required by 28 U.S.C. § 2254(b).

The Fourth Circuit recently described Brady as follows:

> In Brady, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to prove that the Government's failure to tender certain evidence constitutes a Brady violation, the burden rested on [the petitioner] to show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., "prejudice must have ensued"; and (3) that the prosecution had materials and failed to disclose them. United States v. Stokes, 261 F.3d 496, 502 (4th Cir. 2001). . . .
>
> Evidence is "exculpatory" and "favorable" if it "may make the difference between conviction and acquittal" had it been "disclosed and used effectively." United States v. Bagley, 473 U.S. 667, 676 (1985). Evidence is "material" if it is "likely to have changed the verdict." Moseley v. Branker, 550 F.3d 312, 318 (4th Cir. 2008).

United States v. Wilson, Nos. 06-4180, 09-4573, 2010 WL 3495876, *14 (4th Cir. Sept. 8, 2010) (citation omitted).

The Supreme Court has explained:

> Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of trial."

Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 678). Of course, Brady applies to evidence which may be used to impeach a witness. Bagley, 473 U.S. at 676–78; Giglio

12

v. United States, 405 U.S. 150, 154–55 (1972). However, "[t]he State has no obligation to point the defense toward potentially exculpatory evidence when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence." Rector v. Johnson, 120 F.3d 551, 558–59 (5th Cir. 1997).

Here, Smith has not shown that the MAR court's ruling on his Brady claim is based on an unreasonable determination of the facts or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d); Renico, 130 S. Ct. at 1862; Cone v. Bell, 129 S. Ct. 1769, 1784 (2009). Smith has failed to show that the state court's conclusion that there is not a reasonable probability of a different outcome at either phase of trial had the defense received Sumner's letter was objectively unreasonable. Defense counsel specifically discussed with Dr. Mason two of the issues raised in Sumner's letter—the solubility of Di-Syston and the time lapse between ingestion and symptom onset—and Dr. Mason did not think the issues mattered. Moreover, the information concerning these two issues was also available in the material Bayer sent to defense counsel before trial. Although Smith's counsel may have consulted with another expert in light of the Sumner letter, there is no reason to believe that another expert would reach a different conclusion. Sumner's questions regarding the sufficiency of the State's toxicology testing were based on results of other cases where the victim had metabolized the parent compound. In this case, the medical examiners were able to find the parent compound in Britteny's body, and thus did not test for the metabolites. Furthermore, Sumner has no medical training, yet all the medical doctors involved in this case agreed that Britteny was poisoned with an organophosphate, as did both forensic toxicologists (Dr. Anderson and Dr. Mason). Finally, the reasons stated by the MAR court, Sumner's post-conviction testing of the Di-Syston, performed on the eve of the evidentiary hearing, is equally unpersuasive. Thus, the state court reasonably applied Brady to the facts in this case. See Moseley, 550 F.3d at

13

318–25; see also Chandler v. Lee, 89 Fed. Appx. 830, 839 (4th Cir. 2004) (unpublished) (finding no Brady violation in the state's failure to disclose a handwriting analysis report which could have helped impeach the prosecution's main witness; even if "its disclosure could have prompted defense counsel to obtain further analysis[,] . . . [the petitioner] failed to demonstrate prejudice because there is no evidence that further analysis would have conclusively established [the witness] as the author of the note").

In sum, Smith has failed to show that the MAR court's ruling is based on an unreasonable determination of the facts or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d). Thus, his habeas petition fails. Moreover, although Smith has requested an evidentiary hearing, Smith has failed to show any factual dispute that, if resolved in his favor, would entitle him to relief. See Rector, 120 F.3d at 562–63. Accordingly, the court denies his request for an evidentiary hearing.[4]

V.

As explained above, Smith has failed to establish that he is in custody or sentenced in violation of the Constitution or laws of the United States. He is not entitled to the relief he requests and respondent is entitled to judgment as a matter of law. Accordingly, respondent's motion for summary judgment [D.E. 11] is GRANTED, Smith's request for an evidentiary hearing is DENIED, and the petition for a writ of habeas corpus [D.E. 1] is DISMISSED. Moreover, after reviewing the claims presented in the habeas petition in light of the applicable standard, the court finds that

---

[4] To the extent that Smith seeks to raise evidence pointing to the possible guilt of Sylvia, the court notes that all of Smith's contentions regarding the evidence against Sylvia—including DSS's investigation into Sylvia for possible welfare fraud and her inconsistent statements to investigators regarding what the children ate and drank on the night they became ill—were in the hands of Smith's counsel before the trial. The court also notes that "the evidence implicating [Smith] as [Britteny]'s murderer was independently strong." Moseley, 550 F.3d at 322.

14

reasonable jurists would not find the court's treatment of Smith's petition debatable or wrong, and none of the issues are adequate to deserve encouragement to proceed further. See 28 U.S.C. §2253(c); Miller-El v. Cockrell, 537 U.S. 322, 336–38 (2003); Rose v. Lee, 252 F.3d 678, 684 (4th Cir. 2001). Accordingly, a certificate of appealability is DENIED.

SO ORDERED. This the 13 day of September 2010.

JAMES C. DEVER III
United States District Judge